Good morning. May it please the court. My name is Peter Prinkevich of Littler Mendelsohn representing the appellant WG Scottsdale, whom we refer to in the briefs as Sierra Point, and I'll do that today as well. And I would like to try to reserve two minutes for rebuttal. Your Honors, we have submitted four issues for review. The first issue is whether Southwest Fair Housing Council has standing under Article III to bring this action. There's also an issue whether they have standing under Article III to seek injunctive relief. And then there's an issue in terms of the sufficiency of the evidence for the jury to determine that the fictitious individual who is at issue here, his name is Frank, whether it was necessary that he have an ASL interpreter to fully and equally participate in a lease signing. And then finally, whether the punitive damages award, whether there's sufficient evidence to affirm that award. Can I ask you to start with the standing issue and maybe with your second standing issue? Assume for purpose of this discussion that this organization has organizational standing to sue. I'm not sure I understand your argument that even if they have organizational standing, they can't seek injunctive relief. Would you explain that to me? Sure. And as the Court noted, we contest that. But assuming they do have organizational standing, you need standing for each form of relief that you seek. So if you were injured, if you can show past injury to establish organizational standing, which they can't do here, but if they could, they still need standing under Article III to show that they face a real and immediate threat of future injury from Sierra Point. And that's why I'm having some difficulty with this. I want to let you address the first part of the argument. But if, in fact, the jury was correct, and I know you don't want to assume that, but if, in fact, there was evidence that your client violated the act by failing to make a reasonable accommodation, why isn't there, and there was some evidence that they had been involved in litigation about that in the past, why isn't that enough to support injunctive relief? It seems to me unless you win on the organizational standing issue, I don't see how you win on the injunctive relief issue. Well, I'll cite the court to the Lyons case from the Supreme Court, Lyons versus the City of Los Angeles. In that case, Lyons alleged that he was illegally choked by the Los Angeles police officers and was awarded damages for that. So there was a violation. Well, it's pretty unlikely that somebody's going to get choked again by police officers. But here, you guys are in the business of running assisted living facilities. And if they'd established that this facility had discriminated, I'm not asking you to concede that, and they'd established that there had at least been previous allegations, it was a consent decree, so there wasn't a finding, that the company had discriminated, why isn't that enough to support injunctive relief? Because you still have to meet the standard to show a real and immediate threat that you, the plaintiff in this action, would face harm again in a similar way from the defendant in this action. Could we ask you one other question about the injunction before you get back to organizational standing? As I read your briefing, you only attack the power of the court to enter the injunction. You don't attack the scope of the injunction. Is that correct? We're not, correct. We're not dealing with the scope, we're dealing with the authority. I took you off track, so get back to organizational standing, if you would. Okay, so let me go back to organizational standing. In order to show that there's injury in fact for an organization under Havens Realty, you have to show that there's a concrete and demonstrable injury to the organization's activities with a consequent drain of resources. And in that case, as the court recalls, the injury was, the allegation was that there was a concrete and demonstrable injury. Counsel, I guess the problem with that is, you know, the Ninth Circuit precedent has moved far beyond Havens. And, you know, I've been on record saying our organizational standing doctrine is a mess in the Ninth Circuit. So what is the limiting principle that you think that distinguishes your case from the very permissive, broad precedent in the Ninth Circuit saying that, you know, almost anything gets you organizational standing? Well, even under this court's precedence interpreting Havens Realty, there's no organizational standing here because the cases that we cite, including Counsel of La Raza, Sabra v. Maricopa County, Executive Office. What's the distinguishing principle? In each of those cases, there was funds that were spent in ways that they would not have been spent, funds that would not have been spent in ways that they would not have been spent. Is there evidence in the record here that there were, in fact, resources that were spent? So there was additional outreach, there was newsletters that went out, that there was actually work and resources that were diverted, and there was evidence to support that to the jury in this case. So doesn't that meet the standard that you're articulating now? Well, Judge Desai, I dispute the premise of the question. There weren't resources diverted. They already published newsletters. They already do training. But that's not what the evidence was. The evidence was, as I recall, and I think Marin County may be, the Marin Fair Housing case may be the most on point. There was evidence that we hadn't concentrated in the past on housing discrimination against the deaf, and once we encountered this at your client's place, we changed our training methods, we changed our materials. It's not that they wouldn't have been training people. It's not that they wouldn't have had materials. But they diverted their resources from whatever they were doing with them in the past to change their materials to do this. Isn't that enough? No, see, again, they didn't divert any resources. They didn't reallocate resources. They already do training. They added this to their training. They already published newsletters. They did an article. So let me ask you this. How would you define what diverting resources is? Because it sounds like what you're really focused on is sort of the semantics of there has to be some showing in a bank account that if you're creating a newsletter and you've already spent money to do that, now sort of shifting to research additional issues and put them in if the amount of money stays constant, you lose on diverting resources. So how are you defining that term? Because I'm not sure we have something that says what you're saying. I'm defining it, Judge Desai, as you reallocate resources from one activity to another activity in response to the allegations. So you have to be spending more money than you would have spent in the past? Is that your view of diverting resources? You don't have to be spending more money. You have to spend it differently on an activity you wouldn't have spent it on. Well, but see, isn't that what the evidence was? We wouldn't have spent money on creating training materials and trainings that related to discrimination against the deaf. But for the conduct of your client. Now, you may argue that they didn't prove that, but that's a separate issue from whether they submitted evidence about it. But they didn't spend any additional money. That's why we're both asking this question. I asked you if they had to spend more money and you said no. So the question is, why isn't changing the way you spend your existing pot of money sufficient to meet the diverting resources standard? Well, what I meant, no, they don't have to spend additional money than they would otherwise spend, but they have to divert it and reallocate it from something else. For example, in American Diabetes Association, this court looked at where the allegation was there was an attorney dedicated a portion of their time to answering phone calls. A parent called to talk about this new policy that went into effect. They counseled the parent on the policy and they said, had it not been for the policy, we wouldn't have had to spend this staff time on it. But the court said they would have answered the phone call anyway. They just would have said to the parent, sorry, we don't know. But in this case, what they're saying is we changed the type of training we gave to our testers. We changed the written materials. And you say that's not enough. And isn't it even more than what Judge Hurwitz is saying? I'm sorry to interrupt because, I mean, I don't think this organization was really focused on accommodations for deaf individuals at all prior to what they started doing with respect to this issue when they learned about it. But they would have done training anyway. For something else. For something else. Your view is that's not enough. Right, because they would have already, this money was already, there's already an education and outreach division that does training and that publishes newsletters. They were going to publish newsletters about something. They were going to do trainings on something. Isn't there evidence that they diverted and shifted their course towards the deaf and disability prior to encountering Sierra Point? Yes. So how can there be diversion if they already made a decision they want to focus on deaf and disability discrimination and then they find Sierra Point and then they continue that focus? Well, that's true, Judge Bumate, because they've already started training testers before they did the Sierra Point tests on this disability issue. So there's not a diversion in that way because they've already decided to focus on. That's true. Who is it in the record that they had spent resources in their training, education and outreach? I'm not talking about the training of the testers. I'm talking about sort of the work that began once there was a determination that the accommodations were not being provided for particular deaf customers. Where in the record can you point me to that that was already happening? The evidence in the record is the training of testers, Judge DeSign. That's all? Yes. All you can point me to is evidence of training testers, but beyond that, nothing else? Yes, and that's one of the things that they cited. This establishes our diversion. We've trained testers, but they trained testers before this. I have a question on this point because I know you want to get to other things. There's three encounters with testers in this case. Does the fact that they had to send out testers additional times amount to a diversion of resources? I know you contend those are litigation costs, but I can't find any case that says that. Well, the case we cited the court to, there wasn't any Ninth Circuit case that said that. You cited a D.C. Circuit case, but then there's a subsequent D.C. Circuit case that seems to treat repeated investigation costs as not necessarily in contemplation of litigation because you want to find out what's going on. The first visit here is sort of inconclusive. Then the second two, I think your client rather clearly says we're not providing an ASL interpreter. So why doesn't the, at least the third visit, isn't that additional money they wouldn't have to spend absent the alleged violation? No, because it's just like with the other things, Judge Hurwitz. They're going to do testing. Testing is the main thing that they do. You're making an evidentiary argument as opposed to a legal one. No, and in that D.C. Circuit case, which is BMC marketing that we cited the court to, it was also addressed that the second visit, subsequent visits, do not constitute diversion of resources. So that was in that BMC marketing case. I have two questions. Quick. First, are you aware of the Atchison case pending in the Supreme Court dealing with tester standing? The testing that the cert has been granted? Yes. Yes. Arguments can be held this year at some point. Yes. Would that impact this case at all, and should we hold this case in abeyance pending what happens in Atchison? I know it's a tester case, and the Supreme Court's going to be taking it, but I don't know what the overlap might be with this case. In that case, it was an ADA testing standard for – If the tester doesn't have standing, I just don't know how an organization that's doing testing can have standing. So Judge Bumadhey could, I just don't know enough about the facts of that case other than – But you're not asking us to hold this case, wait to see what happens in that case? We're not. Okay. And then the other question I have is Ms. Hardwick testified that she shifted focus – that they decided to shift focus towards deaf and disability based off of a conference in 2014. Or 2015. Do you agree with that? And does that indicate that they've already shifted their focus prior to – That's right, Judge Bumadhey. There was that testimony from Ms. Hardwick. She attended a national conference in 2015, learned about disability testing, and started to make the shift at that point. So that was prior to encountering Sierra Point. That was before they launched any of these tests for any of the 40 organizations. With respect to the changing of the training regimen or materials, the evidence was that that occurred after the encounter. That occurred after. The encounter with your client. The brochures occurred after. But that, just like in Friends of the Earth v. Sanderson Farms, the court said the two temporal bookends we look at are when they learned of discrimination and when they filed a lawsuit. So changing and updating brochures now, which was the testimony from Ms. Hardwick, we're updating brochures now in 2022, is not a diversion of resources. And I'd like, Your Honor, if I could save some time for rebuttal. You may. Thank you. Mr. Rosinsky. Yes. Good afternoon, Your Honors. May it please the Court. My name is Andrew Rosinsky, and I represent Southwest Fair Housing, the appellees in this case. Here there is sufficient evidence of standing that has been conferred upon our client for organizational standing. And the reason for that is because my friend does not dispute that after they found out about the discrimination that they did things differently. In other words, diverted the resources that they could have been doing, providing information about race discrimination. But instead they specifically decided, based on the discrimination that they found. But what was the harm if they didn't divert the resources? What was the harm to the organization if they didn't divert resources? If they did not divert any resources? Isn't that the standard for organization? You have to divert resources in order to avoid a harm. What was the harm if you did nothing in response to Sierra Point? So if we did nothing in response, what was the harm? Yeah. What was the harm to the organization? Well, there was a violation of law, and there's Ninth Circuit cases to say that violations of law can confer standing as to frustration of mission, not diversion of resources. But my understanding is you have to divert resources in order to avoid a harm to the organization. So the tester encounters Sierra Point, there's discrimination. What was the harm to the organization based off of that? And if they did nothing, what would continue to happen to the organization? Oh, okay. I understand your question, Judge Bumate. Okay. So when an organization like this, who their mission is to ensure fair and equal housing in their communities, are made aware that there are entities that are discriminating against the deaf community, they are then compelled to take action. Well, why? Because they now have hard evidence that there are businesses in their community that are discriminating. To address Judge Bumate's question slightly differently and see if you can help us on it. Yeah. Does organizational standing require that there be a separate harm to the organization other than the diversion of resources? If there does have to be a separate harm, it's hard to see one in this case. If there doesn't, then we can focus on diversion of resources. What's your understanding of the law? There doesn't have to be a separate harm aside from diversion of resources here. And they did, there was evidence. So the harm is diversion of resources? Yeah, it's a diversion of their staff time. Because they actually, there's testing. I mean, there's also the doctrine of self-harm. You can't self-harm yourself, right? If you decide to make a shift in your organizational focus, that's not an injury that's caused by Sierra Point. Right. And in this case, this organization has limited resources. And when they're made aware of discrimination, there's other things that they're working on that they have to take time away from to bring their attention to this area. And so other things... And wasn't there evidence that the organization shifted focus to disability, death and disability, in 2014 or 15 before you encountered Sierra Point? Yes, there is evidence that they were educated about this. But there was no evidence for those four years or those several years that they actually did anything to go out there in the community because they were not made aware of specific evidence in their community. They trained testers. I'm sure that's a huge resource. Yes, they were made aware of a New York case in which it was against Atria, actually, in which their investigation bore out evidence of discrimination. And so based on that, that's when they started to... So I guess all of these questions go to how much do you have to do to meet the diversion of resources test. So... And it seems to me in this case, you didn't do much. So is the little you did enough or is there more required? Yes. I mean, even de minimis diversion. But here there was actually... What case says even de minimis? See, I think Marin County is probably the strongest case. There's the Ragon case from the Second Circuit that we cited in our briefs that show that even scant diversion is enough. But I want to go back to the Allure case that we cite in our briefs, which are basically on the same... Similar facts that say that, and Judge Hurwitz, you were pointing to this earlier, that while then testing may not be a diversion, once they're found out to have discrimination, they actually... And they do additional tests because of that. Well, the D.C. Circuit case your friend cites is to the contrary. I think I've discovered a subsequent one, but because nobody cites it, I don't want to put either of you on the spot about it. But assuming that the subsequent tests are not enough, that they are treated as costs in preparation for litigation, what do you got here? So we actually show that they did trainings, that they did newsletters. Okay, but I think the question Judge Bumate asked is the one I'm still interested in. I don't think there's any evidence that they wouldn't have done trainings anyway or they wouldn't have issued the newsletters anyway. There's just the focus of those trainings and the newsletters changed. There's no evidence that more money was spent on training or newsletters. So why is just the change in focus enough? Well, certainly while they did brochures, the information that's contained or the focus of those informations are the diversion. They're diverting from different topics, from one topic to another. Okay, so your contention is that's enough. And that takes time. That takes research. That takes effort. That takes staff resources to do. And, you know, doing trainings. There was no evidence that they were doing regular trainings every three months, you know, like clockwork, and they just incorporated this into their regular three-month training. They actually affirmatively decided to make a training specifically on this point in response to those. Are those things in the record? I'm kind of curious. Yes, they are. Yes, they are. And, you know, another interesting issue in this case is that we were granted summary judgment on standing in our summary judgment motions, and I would ask the court to look back at that decision because in my friend's reply in the brief, you say that the record is pretty set even before trial, and there was not a lot of new information that came out of trial that wasn't otherwise in the record through depositions and whatnot. And based on that record, the judge very thoughtfully cites the case law, the evidence, as well as in her judgment as a matter of law decision as well, and I encourage the court to look at this. Can I ask you to shift focus for a moment? Yes. I would like you to address the sufficiency of the evidence for punitive damages, not the size of the award, but the sufficiency of the evidence. I've looked through all the punitive damages cases cited and the ones that we've granted, and the conduct in this case seems to be substantially less egregious than in most of the cases where we see punitive damages. The facility didn't say I'm not going to take in a deaf person. They didn't say we won't accommodate you in some way. We'll have a whiteboard. We'll have a deaf-enabled telephone. I think the evidence, I should tell you, is sufficient to show that what they did wasn't what they had to do or what they were supposed to do under the law. But why does this all amount to the kind of reprehensible conduct that gives rise to punitive damages? Right. And I would encourage the court to look at the discussion in the trial record when the judge was deciding to give the instruction for punitive damages because there were three trials in this case. In the first case, she did not give the instruction, but in this case, she did. Well, that's what's sort of troubling me. It strikes me as a marginal punitive damages case at best. So why does it fall on the right side of the line? Sure. And, again, the standard review is in the light most favorable to us. Could a jury infer that this was egregious? Well, I know the jury found that, but that's not what I'm asking. I'm asking whether you presented sufficient evidence to create a jury question on reprehensibility. Yes, and what we established is that Atria knew what the law was from the New York case, and there was a court order regarding what they had to do, that they didn't do it, and that they, despite being asked and told several times about him being deaf and primarily communicating in sign language, needing an interpreter, they said flat out, we're not going to do that, period. Not, if it's needed, sure, we'll consider it. We may not give it to you, but let's have a discussion about it. Or, great, you know, let's engage in an interactive process. It was, no, we will not provide that full stop. How does your answer change based on the fact that here there's a tester as opposed to a person who actually needs an interpreter or somebody who's deaf? So, you know, it seems to me that the question about reprehensibility is related to the need and whether or not Sierra knew or there was a person standing before them that actually needed an interpreter. Right, and I would say that those are fact questions based on what the jury saw in terms of the credibility of the evidence that they saw, and I think that the evidence very well, while it could support not giving punitive damages, it certainly could support giving punitive damages in this case, and I believe that the jury exercised their discretion to do so. Well, don't we have, don't, I mean, I think the better answer to Judge Desai's question is there's Ninth Circuit case law that awards punitive damages to an organization based on confrontation with the tester, isn't there? Correct, there is. What case is that? That case is... It's Fair Housing of Marin County. Okay. The one case I keep talking about. Yeah, yeah, yeah. Can I just go back to the organization center real quick? So, assuming, I know you might have said something differently earlier, but assuming, and as I read Lake Forest, one of our Ninth Circuit precedents, it says that an organization must show that it would have suffered some other injury if it had not diverted resources to counteract the problem. So, assuming that's the law, that you have to show that diversion of resources, it was to avoid another injury, what was the injury that was avoided, that the Southwest had to avoid by diverting resources? It was continuing discrimination in their community. Isn't that standard that Judge Bumate is talking about, sort of that additional harm, really the issue that's necessary to get the injunctive relief? I mean, the case that Judge Hurwitz keeps talking about, which is Fair Housing of Marin County, really says that to establish standing, an organization must show frustration of its mission and diversion of its resources. Right. I do read the cases relating to the injunctive relief to include the sort of plus factor regarding harm, but I think that Fair Housing, and tell me if I'm wrong, sort of says if you have a frustration of mission and diversion of resources, that's enough. Yeah, and that's the controlling case law that we have. So, go back to the issue. Well, I mean, if I could just say, assuming that I'm right, that the law requires another injury, do you have another injury to the organization?  That's diversion of resources. Yes. But what injury would that have avoided to the organization? If they did not divert those resources? So, imagine, so the tester encounters discrimination at Sierra Point. If the organization did nothing, what's the injury that would have occurred to the organization? Wouldn't it have been that the possibility of this harm continuing? Yes. With respect to people who are coming to get services from this organization, they would not be accommodated? That's exactly what it would be. How is that an organizational injury? It's to other people. It's to the deaf community, would clearly have an injury, but what's the organizational injury? Well, the Fair Housing Justice Center, their mission is to ensure access for all into housing in their communities. So, when people of any protected class are being harmed, that's a harm to their mission, which is a frustration of their mission, which is the individual. Yeah, put aside the legal consequences of whatever occurred. Your contention is that the injury is that they wouldn't be able to serve the rest of the community they serve as well as they would had these folks not ostensibly violated the law? Correct. This is a very small organization. Whether or not that's legally sufficient, I just want to know what your factual contention is. And does it make a difference that the organization chose to shift its focus to deaf discrimination prior to encountering Sierra Point? I don't think it makes a difference here because there's testimony already on the record that because of them finding this discrimination, that they did additional steps in response to that to counteract the frustration of their mission of equal access in the community. And Chris, just a quick question. Do you have a position on Atchison Hotels, whether or not we should hold it? I don't think this case should be held for that in this case. Is that because in that case, the testers themselves didn't really suffer any injury? Correct. The testers themselves didn't suffer any injury. They were doing precisely what they would have done. What they did was exactly what they would have done had they discovered no discrimination. Well, in that case, it has a lot of procedural issues, but that is one of them, yes. And so I would agree that that deals with ADA and organizational standing under the Fair Housing Act and havens are different issues than necessarily Atchison's dealing with this individual tester for themselves and not an organization. Are you aware that there was a Fifth Circuit case that just came out yesterday, almost the same exact facts as this case? Are you aware of that case? No, I wasn't made aware of that case, yes. So, with that said, I would encourage the Court to look at several entries and also look at potential waiver issues that wasn't brought up in the Rule 50A motion because, as we know, if something's not brought up in the Rule 50A motion, the Ninth Circuit treats it as waived for purposes of Rule 50B. What are you talking about specifically? I'm talking about, you know, in terms of whether it was essential or not or whether an interpreter was essential or whether it was necessary. These were things that weren't objected to in the jury instructions. They were never brought up in the judgment as a matter of law in the 50A and then were brought up for the first time on the 50B and on appeal. So those are some of the, I know we've talked a lot about standing and punitive damages, but I just wanted to briefly address those two arguments. You've exceeded your time allocation. Thank you. Thank you, Your Honor. We took counsel a little bit over, so put two minutes on the clock. Thank you, Judge. A few points. First of all, we did certainly raise in our Rule 50A motion that the evidence wasn't sufficient to show that an interpreter was necessary, so that's not waived. One point I wanted to make, Judge Bumate, in terms of whether you need to show some additional injury, this is from East Bay Sanctuary Covenant v. Biden, the 2029 circuit case. We conclude that the organizations have established that the rule has perceptibly impaired their ability to perform the services they were formed to provide. This is sufficient for organizational standing. It is sufficient, I agree. Is it necessary? Yes. This is following, tracking along what Havens Realty did. There has to be some damage to the organization. That's the frustration of the mission, correct? I mean, it's being said differently, but the core of it is that if the mission of the organization is being frustrated, that is injury, harm, damage, whatever word you want to use that's necessary for organizational standing. It's all the same. Judge Desai, I think the question this Court has to answer, based on these precedents, is what service was Southwest perceptibly impaired from providing because of Sierra Point's conduct? And the answer, it's not in this record. Well, I guess the question I pose to you is, do they have to show that they were impaired from providing a service, or do they just have to show that they diverted their resources from one area to another? I think they have to show both, Judge. And if I could say one thing. Sorry, just before you go. Because it was a little unclear to me, are you contesting frustration of mission? Because it seems there is a frustration. I mean, their mission is to combat discrimination in housing. So, frankly, if they found no discrimination, that would frustrate their mission. Finding discrimination is purely in line with their mission. But I don't know if you're contesting frustration. Because it's defined so broadly, no, Judge. You're not contesting frustration. Right. And then I wanted to say a couple things on the injunction. In order to have an injunction, there has to be a certainly impending injury under Clapper to the plaintiff, not to anyone. A certainly impending injury to the plaintiff from the defendant. There's no evidence on that record to support an injunction. And the last thing, Judge Hurwitz, with respect to punitive damages, the Combs case that you cite, in that case, that was a punitive damages case. The renter, the owner did not want to rent to black individuals, called them all kind of epithets. No, I know those cases were worse. I guess my question, and maybe you can wrap up with this one, is why isn't yours bad enough? Because what Sierra Point did here, Judge, was to provide, instead of an interpreter, offer a whiteboard to somebody who they were told could read and write. And when they offered a whiteboard, the testers always said okay, leading them to believe that that would be okay. That is not discrimination. No, they actually didn't. They said mm-hmm the first time. The second time, they ended by asking, but can't you provide an ASL interpreter, as I recall the record, or at least the third time, and your client said no. No, they only asked once for an ASL interpreter, and that was in the record of a phone call. None of the transcripts, they ever even asked for an interpreter one time. But there are three encounters, are there not? Yes, the middle one. They asked for an ASL interpreter the second two times. The middle one is when they asked over the phone for an interpreter for a lease. Sure, that's the purpose that this fictitious person was going to come in for. But then, Judge, they came back with a third test in which they were instructed, make sure you say that an interpreter is needed, and they didn't ask for an interpreter. And then when we said we'll use a whiteboard, the tester did say okay twice. So that is not discrimination in the face of a perceived risk that we'd be violating Federal law sufficient to support acute damages. But they'd already been told that they couldn't have an interpreter in the second call. The organization itself decided to send the tester back after that. So does the tester have to say, have you reconsidered your previous decision not to provide an interpreter? No, Judge. They just have to convey that it's needed. And just asking for it doesn't convey that it's needed. If it was conveyed that it was needed by the time of the second one, do you agree that they made the request? Yes. They don't have to repeatedly convey that it's needed. But our point is they never convey that it's needed and led Sierra Point to believe that it was not needed when they kept saying okay. And so, Judge, I'll wrap up. Please. It's not a punitive damages case because there was no discrimination in the face of a perceived risk that they were violating Federal law, especially when the court compares it to other punitive damages cases. And I thank the court for its time. We thank both counsel for their arguments and for their briefing. And this case will be submitted.
judges: HURWITZ, BUMATAY, DESAI